IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

DEBRA MARRERO,                        §
                                      §
            Plaintiff,                §
                                      §
v.                                    §            1:23-CV-1318-RP
                                      §
TEXAS DISPOSAL SYSTEMS, INC.,         §
                                      §
            Defendant.                §

## ORDER

Before the Court is Defendant Texas Disposal Systems, Inc.'s ("Defendant") Motion for

Summary Judgment, (Dkt. 22), and Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt.

34). Having considered the parties' briefing, the record, and the relevant law, the Court issues the

following order.

## I. BACKGROUND

Plaintiff Debra Marrero ("Plaintiff") alleges that she suffered impermissible discrimination

and retaliation from Defendant under Title VII of the Civil Rights Act of 1964 ("Title VII"), the

Texas Commission on Human Rights Act, ("TCHRA"), the Americans with Disabilities Act

("ADA"), and the Family and Medical Leave Act ("FMLA").

Plaintiff worked for Defendant as a Safety Officer, a position for which Defendant's

Director of Safety, Walter Black ("Black"), hired her on November 8, 2019. Plaintiff reported

directly to Black's subordinate, Lucas Martinez ("Martinez"). (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at

3). Plaintiff asserts that, throughout her tenure as an employee, Black made several inappropriate

comments to her. The first occurred when Black, Plaintiff, and another team member "went to

Sealy," shortly after Plaintiff's hire in November 2019. (Pl. Dep., Dkt. 29-1, at 4, 7).[1] Black appeared to invite Plaintiff and her husband to his house to play Cards Against Humanity, a popular card game. (*Id.*). Because Plaintiff had not heard of Cards Against Humanity, Black explained that it was a "sexual game" that "had to do with cards." (*Id.*).[2] Plaintiff complained about this conversation to Martinez and informed him that it made her uncomfortable. (*Id.* at 5). Martinez agreed he would not go to Black's house if invited. (*Id.* at 6).

About a year after she was hired, effective October 6, 2020, Black promoted Plaintiff to Safety Learning and Development Manager. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 3). Plaintiff was responsible for developing and implementing safety training, including "Smith System" training. (*Id.*). Defendant utilizes the Smith System to provide commercial drivers with classroom and on-road driver training. (Mot. Summ. J., Dkt. 22, at 2). At the time of her promotion, Plaintiff was told that Defendant was prioritizing Smith System training. (*Id.*). Plaintiff understood, however, that she was responsible for ensuring training compliance across all programs, not just Smith System training. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 4). The parties agree there was a significant backlog of existing employees who had not received Smith System training at the time Plaintiff took over. (*Id.*). Plaintiff asserts that the backlog was due to the limited class sizes, the limited capacity of the passenger van required for the driving test part of the course, and the COVID-19 pandemic. (*Id.*).

The parties also agree that at some point, Black directed Plaintiff to make Smith System training her sole focus. (*See* Mot. Summ. J., Dkt. 22, at 2; Pl. Dep., Dkt. 22-1, at 13). According to Plaintiff, this directive came down in the summer of 2021—months after she was promoted. (Pl.'s

---

[1] All citations will reference the page number of the document that has been filed on the docket. Because the depositions have been excerpted, this number may not match the page number of the full deposition transcripts.

[2] It is unclear whether Black described Cards Against Humanity as a "sexual game" or if this is Plaintiff's characterization or summary of his explanation. Defendant has moved to strike the statement as hearsay. (Mot. Strike, Dkt. 34). The Court ultimately determines the statement is admissible, *infra* Section III.A.1.d.

Resp. Mot. Summ. J., Dkt. 29, at 9). But around the same time, Black requested Plaintiff prepare another evaluation program unrelated to the Smith System and continued to follow up and request that she prepare this evaluation through the end of July 2021. (*Id.*). Defendant, on the other hand, asserts Black directed Plaintiff to focus solely on the Smith System trainings much earlier summer 2021. (Mot. Summ. J, Dkt. 22, at 2–3). Plaintiff instead allegedly "chose to develop other trainings on topics she deemed more important." (*Id.* at 2).

In early November 2020, about one month after Plaintiff's promotion, Black referred to Plaintiff as a "whore" and stated that Plaintiff's daughter's name, "Alexa Rayne," made her "destined to be a hooker or a stripper" in front of Plaintiff and Martinez. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 5). Martinez made a complaint to the company's Human Resources department ("HR") about the comment. (*Id.*). HR Director Janice Brewster Martinez ("Brewster") called Plaintiff to discuss Martinez's complaint. (*Id.*). When Plaintiff complained about the incident, Brewster responded, "We have to be forgiving." (*Id.*). Brewster believes she discussed these complaints with Black but does not recall the conversation. (*Id.*; Brewster Dep., Dkt. 29-4, at 6). Brewster took no further action and did not document either Martinez's or Plaintiff's complaints. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 5).

In December 2020, Calvin Cunningham ("Cunningham"), a safety trainer reporting to Plaintiff, discussed challenges he had with his tracheostomy tube sometimes impeding his ability to speak. (Mot. Summ. J., Dkt. 22, at 3). It is undisputed that Cunningham's job as a trainer requires him to do public speaking in the classroom. (*Id.*). When Plaintiff discussed these challenges with Black, Black directed her to prevent Cunningham from performing any more trainings. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 5). Black then held a meeting with Plaintiff, Cunningham, and Lisle Ford ("Ford"), the Senior Smith System Instructor, telling them, "I don't want Calvin facilitating." (*Id.*). When Cunningham asked why, Black responded, "Because I said so." (*Id.*). The next day, when

Plaintiff informed Cunningham he could not facilitate per Black's instructions, Plaintiff claims that Cunningham complained Black was discriminating against him. (*Id.* at 6). Defendant disputes whether Cunningham actually complained of disability discrimination but does not dispute that he was upset about Black removing him from trainings. (Def.'s Reply Mot. Summ. J., Dkt. 32, at 5). To support her claim that Cunningham referenced disability discrimination, Plaintiff puts forth her deposition, in which she states that Cunningham was "angry because he could do the class" and Ford's deposition, in which he confirmed that Black had "told [Cunningham] he could no longer do trainings" because "he did not want him in the classroom anymore." (Pl. Dep., Dkt. 29-2, at 8; Ford Dep., Dkt. 29-2, at 18). Defendant argues that this fails to establish Cunningham had made a complaint about disability discrimination. (Def.'s Reply Mot. Summ. J., Dkt. 32, at 5).

On January 25, 2021, Plaintiff met with Brewster, Black, Cunningham, and Sarah Adams ("Adams"), the Benefits Coordinator. (*Id.*). Plaintiff complained about Black's discrimination of Cunningham to Brewster. (*Id.*). Following this meeting, Plaintiff sent an email to Brewster, writing, "I think you [Brewster] know that Walter is not a fan of . . . Cal [Cunningham]," and "[i]n my opinion, as long as they're working under his department, he will continue to look for ways to remove [him], causing chaos within my team." (Pl. Dep. Ex. 4, Dkt. 32-1, at 16). Plaintiff proposed a solution that would move remove her team—including Cunningham—from Black's supervision, but this never came to fruition. (*Id.* at 17). Cunningham continued to work in his facilitator position for several months until he chose to step back from a speaking position. (Mot. Summ. J., Dkt. 22, at 3). Defendant explains that before Cunningham stepped down, Black, Marrero, and HR had ongoing discussions and worked with Cunningham to help him continue working while ensuring trainings were competent and clear. (*Id.*). Cunningham never filed a formal disability discrimination claim against Black. (*Id.*).

4

On January 28, 2021, three days after Plaintiff sent her email, Plaintiff met with Brewster, Black, Adams, and Sarah Jones, Defendant's attorney, to discuss Plaintiff's complaint of disability discrimination. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 6). Brewster warned Plaintiff not to put her complaints in an email because emails are "discoverable." (*Id.*). Brewster also stated that "Walter said . . . [Plaintiff] hadn't done anything" in her position. (Pl. Dep., Dkt. 29-1, at 34). Plaintiff presented documents to Brewster as proof of her work, seeking to establish that Black was misrepresenting the truth in retaliation for Plaintiff's complaints. (*Id.*).

Plaintiff asserts that, after this meeting, Black's retaliation against her increased. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 7). He allegedly lied about her performance, micromanaged her team, removed her from important training emails and meetings, required her to copy him on all emails, required her to develop course evaluations, prevented her from bringing the company into compliance in multiple areas, and stopped her from putting training programs together. (*Id.* at 7).

In March 2021, Plaintiff applied for a promotion to Senior Training and Compliance Manager after the hiring manager, Director of Maintenance Eli Garza ("Garza"), encouraged her to do so. (*Id.*). In his affidavit, Garza states that he believed Plaintiff was the best fit for the role based on her experience and qualifications. (Garza Decl., Dkt. 29-5, at 1). Garza voiced this opinion to Martinez, but Martinez stated she did not want to promote Plaintiff without explaining why. (*Id.*). When Garza discussed the decision with Defendant's CFO Tom Mistler ("Mistler"), Garza claims Mistler said "that" (presumably the employment decision) "didn't change" and that "Janice [Brewster] said [Plaintiff] would never get the position." (Pl. Dep., Dkt. 29-1, at 24). Based on these statements, Plaintiff claims Brewster prevented her from getting the promotion. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 22).

Defendant disputes Plaintiff's interpretation. "No one, including Garza, states that Brewster Martinez had the authority to or did prevent Plaintiff from being hired." (Def.'s Reply Mot. Summ.

J., Dkt. 32, at 5). Defendant also asserts that the position change would not have come with a pay raise and that Garza had sole authority over the hiring decision. (Mot. Summ. J., Dkt. 22, at 3). Plaintiff had interviewed with Garza, as well as with Martinez and Defendant's Senior Vice President of Operations and Maintenance, Randy Meier ("Meier"). (*Id.*). Meier and Martinez felt Plaintiff was not qualified for the maintenance training role because the role needed someone with experience in mechanics and maintenance of commercial vehicles, which Plaintiff lacked. (*Id.* at 3–4). They shared this assessment with Garza. (*Id.*). Garza left Defendant's employment on April 7, 2021, without ever filling the Senior Training and Compliance Manager position. (*Id.* at 4). Defendant eventually promoted a female candidate from the maintenance department to the position. (*Id.*).

On March 25, 2021, Plaintiff filed a Charge of Discrimination with the EEOC ("First Charge"). (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 8). In her First Charge, Plaintiff complained of sex discrimination and retaliation for her complaints of sex discrimination and disability discrimination—specifically pointing to Black's alleged retaliatory conduct and Brewster's denial of her promotion. (*Id.*). The Charge was referred to the legal department for investigation, but no investigation occurred. (*Id.*).

At some point, Black told Martinez, "I'll never hire another woman again." (*Id.*). Plaintiff asserts Black made this comment after she filed the First Charge and Martinez told Plaintiff about it, (*id.*), but Martinez testifies he does not remember when Black made the comment or telling Plaintiff, (Martinez Dep., Dkt. 29-3, at 14–15). Plaintiff testified that Martinez informed her he reported the comment to Defendant's legal team or Mistler. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 8). Martinez states that he did not report the comment to HR. (Martinez Dep., Dkt. 29-3, at 7). Plaintiff claims that Black continued to micromanage her during this time. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 8). Defendant, on the other hand, asserts that Plaintiff was not reprimanded and suffered no adverse action for filing the First Charge. (Mot. Summ. J., Dkt. 22, at 4).

On June 4, 2021, Plaintiff sent an email to Brewster complaining about Black's "continuous reprisal on me, to manage me out of the business." (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 9). She wrote, "It's imperative that this meeting take place as soon as possible to discuss the events which have taken place and how to bring this to an end." (*Id.*). Brewster did not respond to Plaintiff's complaint and instead forwarded it to the legal department, which did not investigate the allegation. (*Id.*). On August 27, 2021, Black resigned, and Martinez became Plaintiff's direct supervisor. (*Id.*).

On September 24, 2021, Martinez and Plaintiff met to discuss the Smith System training and reduce the backlog. (*Id.*). Around this time, Martinez agreed and authorized Plaintiff to move forward with a plan to add additional classes. (*Id.*). Three days later, Plaintiff sent a draft email to Martinez for review regarding the efforts they had discussed. (*Id.*). The plan stated from "October 5th through the end of January 2022, we have scheduled 60 days of Smith System training; throughout the week as well as some Saturdays." (*Id.*). About five minutes later, Martinez sent Plaintiff's draft email to all managers. (*Id.*).

On October 4, 2021, Adam Green ("Green") was hired by Defendant in a newly created position of Director of Risk Management. (*Id.*). Martinez remained Plaintiff's direct supervisor, but they both reported to Green. (Martinez Dep., Dkt. 29-3, at 23). Six days later, on or about October 10, 2021, Plaintiff broke her ankle and notified Defendant she would need time off work. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 9). Plaintiff alleges that she provided the ADA and FMLA paperwork to her doctor for her reasonable accommodation and family medical leave. (*Id.* at 13). The doctor allegedly sent the paperwork to Defendant, but Defendant rejected the documentation and requested it be resubmitted. (*Id.*). Plaintiff's doctor's office faxed the new forms to Defendant, but Defendant claims they were not received. (*Id.*).

On November 30, 2021, Green issued Plaintiff a Termination Notice based on her unsatisfactory performance with the Smith System training. (*Id.*). Plaintiff alleges that she was

actively engaged in the process of requesting family medical leave when Defendant terminated her. (*Id.* at 14). Martinez, in his deposition, testified that the "last conversation" he had with Green regarding Plaintiff "was specifically about me offering my help in either getting her the [disability] paperwork she needed or me picking her up and bringing her to the office." (Martinez Dep., Dkt. 29-3, at 23). Based on Martinez's representation, Plaintiff asserts that "Green was aware of Plaintiff's disability, request for medical leave, and her being in the middle of completing the paperwork to request Family medical leave prior to her termination." (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 14). Accordingly, Plaintiff asserts she has "a reasonable belief that her termination, in part, occurred before completing her medical forms to prevent her from receiving protection under the Family Medical Leave act." (*Id.*).

Further, Plaintiff argues that the Termination Notice contained several factual inaccuracies, revealing Defendant's reason for firing her was pretextual. (*Id.* at 11). These purported factual inaccuracies are:

- The Termination Notice states, "On 9/24/2021, your manager, Lucas Martinez, reviewed the training program and discovered that, in spite of the backlog, you were only conducting training classes once per week, which included new hires and you were not providing alternative classes or hours to accommodate business needs." (*Id.* at 11–12; Dkt. 29-13). Smith System sign-up sheets in 2021 show that classes were conducted more than once a week and on weekends on some occasions, though they did occur only once a week during some weeks. (Dkt. 29-14). Defendant also argues that Friday trainings on weeks that had more than one training were "new hire" trainings and therefore would not reduce the backlog. (Def.'s Reply Mot. Summ. J., Dkt. 32, at 5). Defendant also asserts that Plaintiff had held trainings on only five Saturdays and no Sundays before September 24, 2021, but Ford conducted five weekend trainings between October 30, 2021, and December 18, 2021, when Plaintiff was either on medical leave or had been terminated. (*Id.*). According to Defendant, these numbers indicate that Ford reduced the backlog, which Plaintiff failed to do. (*Id.*).

- The Termination Notice states, "On October 11, 2020, the company had 100 drivers who were behind with required Smith System training . . . September 24, 2021, that number had more than doubled to about 226 drivers." (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 12). Plaintiff argues that these numbers are meaningless without knowing how many employees Defendant hired in 2020 or 2021, which Defendant's

corporate representative did not know. (*Id.*). These numbers are important because the number of Defendant's employees trained in the Smith System grew from 95 in 2020 to 495 in 2021. (*Id.*). Plaintiff attributes this increase to her efforts. (*Id.*).

- The Termination Notice states, "Black advised you on 1/26/2021 to put all your other projects on hold." (*Id.*). Plaintiff argues that Black's directive conflicts with Black assigning her other work that prevented her from making the Smith System project her sole focus. (*Id.*). She also asserts that the directive came down later, in the summer of 2021. (*Id.* at 12–13).

- The Termination Notice states, "In your absence which began on October 11, 2021, the number of current drivers who were never trained on Smith System training has been reduced from 53 to 16 to date." (*Id.* at 13). Plaintiff asserts that there were no changes to training in her absence, and that the training plan announced by Plaintiff and Martinez went forward as planned. (*Id.*). Martinez said he did not make any changes to the training program "specifically," but began "leaning a little bit more on [Ford] to facilitate the training and to get the numbers down." (Martinez Dep., Dkt. 29-3, at 21). Ford testified that, in Plaintiff's absence, he "called managers to schedule training and went onsite for training." (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 13). Ford testified that he also discovered that the online sign-up sheet Plaintiff had developed was ineffective. (Mot. Summ. J., Dkt. 22, at 5). Plaintiff argues she had directed him to call managers prior to her accident, on October 4, 2021, and the travel-to-train initiative was already part of the training program she rolled out before she took medical leave. (*Id.* at 13).

Martinez, who was Plaintiff's direct supervisor at the time she was terminated, was not involved in Green's assessment of Plaintiff's performance, and Green never spoke to him about Plaintiff's performance or the decision to terminate her. (*Id.* at 11). In his deposition, Martinez stated that the Termination Notice indicates Green relied on Black's assessment of Plaintiff's performance, presumably because she was reporting directly to Black during the relevant times cited in the Termination Notice. (Martinez Dep., Dkt. 29-3, at 24–25).

On January 27, 2022, two months after her termination, Plaintiff submitted a second Charge of Discrimination to the EEOC ("Second Charge"), complaining of discrimination based on sex and retaliation for her protected complaints and opposition to discrimination of sex and disability in violation of Title VII and TCHRA. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 14).

Following Plaintiff's termination, Martinez messaged Plaintiff on Facebook and said:

- "I hope you know I didn't have anything to do with your leaving. I never once asked for that . . . actually the opposite. But it was out of my hands."

- "You and I could have made a difference if there had been no Walter. He fucked it all up."

- "We had a good team minus Walter of course."

(*Id.*).

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record

and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

### III. DISCUSSION

#### A. Motion to Strike

Defendant moves to strike portions of depositions, Plaintiff's affidavit, and Garza's affidavit. The Court will address each piece of evidence in turn.

##### 1. Deposition Testimony

Defendant argues that certain portions of depositions purporting to quote out-of-court statements are hearsay and should be excluded. (Mot. Strike, Dkt. 34, at 1). These statements are:

(a) Alleged statement by Cunningham that he thought Black was discriminating against him based on his disability. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 6, ¶ 9).

(b) Alleged statement by Black to Martinez, that Black would "never hire another woman." (*Id.* at 8, ¶ 19).

(c) Alleged statements by Mistler regarding Black or the job Plaintiff was applying for in Garza's department. (*Id.* at 7–8, ¶¶ 15, 19; 23).

(d) Alleged statements by Black regarding a "sexual game" and any alleged statements from Martinez regarding what he thought of Black's alleged comments. (*Id.* at 4, ¶ 19)

The Court will address each statement in turn.

###### a. Cunningham's statement that he thought Black was discriminating against him based on his disability

In January 2021, in a meeting with Plaintiff, Ford, and Cunningham, Black told Plaintiff, "I don't want Calvin [Cunningham] facilitating." (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 5). The next day, when Plaintiff informed Cunningham that he could not facilitate, Cunningham allegedly told

Plaintiff that Black was discriminating against him based on his disability by not allowing him to train. (*Id.* at 6).[3] Plaintiff argues that this statement is admissible as Cunningham's present-sense impression, Fed. R. Evid. 803(1), as an excited utterance, Fed. R. Evid. 803(2), and as Cunningham's then-existing mental or emotional state of Cunningham, Fed. R. Evid. 803(3).

The Court agrees with Defendant that the statement does not fall into any of these exceptions. It is not a present-sense impression because it was made a day after Cunningham was made aware of Black's refusal to let him teach. Fed. R. Evid. 803(1) (explaining that the statement must be made "made while or immediately after the declarant perceived it"). It is not an excited utterance because even though Cunningham may have been excited or upset, he was not under the "stress of excitement" caused by Black's refusal to let him teach. Fed. R. Evid. 803(2). And it is not a statement of Cunningham's then-existing mental state because it describes the motivation of someone else. *See United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980) ("If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—'I'm scared'—and not belief—'I'm scared because Galkin threatened me.' The latter of which is not admissible as an exception to hearsay.").

However, these statements are not being offered for the truth asserted. For purposes of this dispute, it does not matter whether Black was actually engaging in disability discrimination against Cunningham. Rather, what matters is that Plaintiff believed that Black was discriminating and made a report to that effect. Cunningham's statement is admissible.

    b. Black's statement to Martinez that Black would "never hire another woman"

---

[3] As mentioned above, the deposition testimony Plaintiff cites to establish that Cunningham complained about disability discrimination does not explicitly state that he complained about discrimination—only that he complained about Black refusing to let him train. Nevertheless, the Court will credit Plaintiff's characterization of the complaint for the purposes of deciding the motion to strike. Any dispute about whether Cunningham explicitly raised disability discrimination goes to the weight of the evidence.

Martinez, in his deposition, testified that he heard Black say this comment but does not remember when. (Martinez Dep., Dkt. 29-3, at 14–15). Plaintiff argues that this statement is admissible as Black's then-existing mental or emotional state. Fed. R. Evid. 803(3). The Rule provides an exception for "the declarant's then-existing state of mind (such as motive, intent, or plan)." *Id.* Black's statement reveals his intent or plan never to hire another woman, so it falls into the exception.

c.  Statements from Mistler regarding Black or the job Plaintiff was applying for in Garza's department

In Plaintiff's deposition, she explained that she spoke with Garza, who allegedly said that he "went to Tom [Mistler]" to discuss her promotion. (Pl.'s Dep., Dkt. 29-1, at 24). Garza explained to Plaintiff that Tom said "that it didn't change" and "Janice [Brewster] said [Plaintiff] would never get the position." (*Id.*). Plaintiff uses his statement to support her claim that Garza told her he had discussed her promotion with Mistler and was still denied the ability to hire her because of Brewster. (Def.'s Reply Mot. Strike, Dkt. 36, at 4). Plaintiff argues that the statement was made by Mistler "as the COO . . . in a representative capacity of Defendant," so it is admissible as the opposing party's statement. (Pl.'s Resp. Mot Strike, Dkt. 35, at 2). In response, Defendant argues that the statement should be excluded because "Plaintiff does not identify what was actually said by Mistler," and it is not believable that "Mistler *deferred to his subordinate* employee and blocked [Plaintiff's] promotion." (Def.'s Reply, Dkt. 36, at 4) (emphasis in original).

To the contrary, the Court finds that Plaintiff has explained Mistler's comments with sufficient clarity, even if she cannot recall them verbatim. And whether it makes sense for Mistler to have deferred to Brewster goes to the weight of the evidence. Because Mistler seems to have been commenting on whether Garza could hire Plaintiff for the position, the comment was made within the scope of his employment and is admissible.

Plaintiff also testified that Martinez "told legal counsel or Tom [Mistler]" about Black's statement that he would "never hire another woman," to which "legal counsel said he's stupid, he's so stupid to have said that." (Pl. Dep., Dkt. 29-1, at 15). Though the Court agrees with Defendant that it is unclear whether the statement was made by Mistler or legal counsel, it was made by one of Defendant's employees or agents within their scope of employment, so it is admissible.

d.  Statements by Black regarding a "sexual game" and any statements from Lucas Martinez regarding what he thought of Black's comments

Plaintiff alleges that when Black, Plaintiff, and another team member "went to Sealy," Black "made an indication" of inviting Plaintiff, her husband, and other team members to his house to play Cards Against Humanity, a popular card game. (Pl. Dep., Dkt. 29-1, at 4). Because Plaintiff had never heard of the game, Black allegedly explained "that it was a sexual game and it had to do with cards." (*Id.*). It is unclear whether Black had called Cards Against Humanity a "sexual game," or if Plaintiff is providing a summary of his explanation. Plaintiff states she mentioned her discomfort to Martinez, who allegedly said, "[I]f he invited Jessica and myself, we wouldn't go." (*Id.* at 6). Plaintiff argues that both statements are admissible as an opposing party's statement because Black and Martinez were Plaintiff's supervisors, and they made the statements while representing Defendant, in their capacities as employees of Defendant. (Pl.'s Resp. Mot. Strike, Dkt. 35, at 2 (citing Fed. R. Evid. 801)). Plaintiff also asserts that they are permitted as a then-existing mental or emotional state of Black and Martinez. (*Id.* at 3 (Fed. R. Evid. 803(3)).

To qualify for a hearsay exception as the statement of a party opponent, "the proponent of the statement must show, through evidence independent of the proffered statement, that (1) there existed an employment relationship between the declarant and the party, (2) the statement was made during the agency or employment relationship[,] and (3) the statement concerned a matter within the declarant's scope of employment." *Livingston v. Dollar Tree Stores*, No. 1:19-CV-102, 2020 U.S. Dist. LEXIS 115992, at *15 (E.D. Tex. 2020).

Defendant argues that the statements are not subject to the hearsay exception because "[t]hey involved a gathering in a private residence and thus would be outside the scope of [] employment and not a hearsay exception." (Def.'s Reply Mot. Strike, Dkt. 36, at 6). The Court disagrees. Black made the statement to Plaintiff while they were on what appears to be a work trip and indicated that he would invite other team members as well. (Pl. Dep., Dkt. 29-1, at 4). Though the gathering would occur in Black's home, he may have intended for it to be a teambuilding event. It is within the scope of employment as a supervisor to foster working relationships between team members. Martinez's comment, however, arguably does not fall into this exception because he was offering his personal opinion on the matter.

The Court finds that Martinez's comment falls more squarely within the exception for then-existing mental or emotional state. *See* Fed. R. Evid. 803(3). Here, Martinez is communicating his intention or plan not to attend a gathering at Black's home to play Cards Against Humanity. The statements are admissible.

### 2. Plaintiff's Affidavit

Defendant also moves to strike portions of Plaintiff's affidavit, (Pl. Aff., Dkt. 29-11). Under the "sham affidavit" rule, if a party submits an affidavit that conflicts with the affiant's prior sworn testimony and does not provide a sufficient explanation for the conflict, a trial court may disregard the affidavit when deciding whether the party has raised a genuine fact issue to avoid summary judgment. *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). Defendant argues the Court should disregard portions of Plaintiff's affidavit that conflict with her deposition testimony. (Mot. Strike, Dkt. 34, at 2). The Court will discuss each of these potential conflicts in turn.

First, Plaintiff states in the affidavit that after Black commented that Plaintiff's daughter's name made her "destined to be a hooker or a stripper," Martinez submitted a complaint to HR regarding the comments. (Pl. Aff., Dkt. 29-11, at 2). Plaintiff left work early for the day, and when

Brewster called to discuss Martinez's complaint, Plaintiff "complained to Brewster regarding what [she] believed to be discrimination based on [her] sex." (*Id.*). Defendant argues that these statements "impl[y] that *at the time* of Black's alleged rude joke about her daughter's name, [Plaintiff] reported to HR that his comments were discriminatory." (Mot. Strike, Dkt. 34, at 3). These statements purportedly conflict with Plaintiff's deposition because, when Defendant's counsel asked Plaintiff whether she had told Brewster that she "thought it was discriminatory to call [her] [] daughter a stripper or a hooker," Plaintiff responded, "Not on the call." (Pl. Dep., Dkt. 29-1, at 39).

Second, Plaintiff states in the affidavit that in her January 25, 2021, meeting with Brewster, Black, Cunningham, and Adams regarding Black's demand that Cunningham no longer conduct Smith System trainings, Plaintiff complained that Black was discriminating against Cunningham on the basis of his disability. (Pl. Aff., Dkt. 29-11, at 3). She also states that, following the meeting, she sent an email to the group regarding Black's disability discrimination, "trying to offer a solution." (*Id.*). Defendant argues that these statements conflict with Plaintiff's deposition testimony confirming she had sent the email, which "made no reference to discrimination or Cunningham's disability." (Mot. Strike, Dkt. 34, at 3). The email is included as an exhibit to the deposition. (Pl. Dep. Ex. 4, Dkt. 32-1, at 16). In that email, Plaintiff wrote, "I think you [Brewster] know that Walter is not a fan of . . . Cal [Cunningham]," and "[i]n my opinion, as long as they're working under his department, he will continue to look for ways to remove [him], causing chaos within my team." (*Id.*). Plaintiff proposed a solution that would move her team—including Cunningham—from the department that Black oversaw to a different department. (*Id.* at 17).

Third, Plaintiff's affidavit states that she had a "reasonable belief" that her "termination, in part" occurred prior to her submitting completed FMLA forms to prevent her from receiving protection under the FMLA. (Pl. Aff., Dkt. 29-11, at 6–7). This statement, according to Defendant,

contradicts Plaintiff's deposition testimony that she did not know whether Green, who terminated her, knew that she was submitting FMLA paperwork. (Pl. Dep., Dkt. 32-1, at 13).

Plaintiff, in her response to the motion to strike, explains that she presented her sworn affidavit "to clarify confusion and recall difficulties presented during her deposition." (Pl.'s Resp. Mot. Strike, Dkt. 35, at 3). Plaintiff's deposition was taken prior to the full discovery of documentation and deposition of Defendant's witnesses. (*Id.*). Plaintiff argues that she therefore did not have the opportunity to review the discovery in this case before the deposition, and after that review, "her confusion and recall became better." (*Id.*).

The Court does not find that the affidavit and deposition testimony conflict. For the first two purported conflicts, though Plaintiff may have overstated how explicitly she complained about discrimination on the call to Brewster and in her email about Cunningham, the affidavit and deposition are not substantially different. First, in the call, she may have complained about Black's discriminatory statements without naming them as such. In the deposition, Defendant's counsel had asked her whether she had told Brewster that she "thought it was discriminatory to call your [] daughter a stripper or a hooker." (Pl. Dep., Dkt. 29-1, at 39). That Plaintiff did not explicitly complain that the comment was discriminatory is not inconsistent with the notion that she "complained to Brewster regarding" events that she "believed to be discrimination based on [her] sex." (Pl. Aff., Dkt. 29-11, at 2). Second, as for the email, the Court agrees with Defendant that the email did not explicitly reference disability discrimination. However, Plaintiff did state that Black was "not a fan" of Cunningham, and tried to propose a solution that would remove Cunningham from Black's line of supervision, as she explained in her affidavit. (Pl. Dep. Ex. 4, Dkt. 32-1, at 16). Though Plaintiff did not make an explicit reference to Cunningham's disability, the Court finds that her acknowledgement of Black's perceived negative feeling toward Cunningham is consistent with

her affidavit statement that she "sent an email to the group regarding [] Black's disability discrimination." (Pl. Aff., Dkt. 29-11, at 3).

Finally, for the third conflict, the fact that Plaintiff believes that Defendant decided to terminate her before she submitted her FMLA forms to prevent her from getting those protections does not conflict with her lack of knowledge as to whether Green knew she was applying for FMLA. As explained above, Plaintiff bases her claim regarding Green's knowledge on Martinez's testimony that Martinez had offered to get Plaintiff her paperwork in their last conversation regarding Plaintiff. (Martinez Dep., Dkt. 29-3, at 23). In her deposition—which could have occurred before she had the opportunity to review Martinez's testimony—she testified that she did not personally know whether Green knew that she was submitting FMLA paperwork. (Pl. Dep., Dkt. 32-1, at 13). That she now believes Defendant terminated her to prevent her from receiving FMLA protection is not inconsistent with the notion that she did not know at the time of her deposition.

Therefore, though the Court acknowledges that Plaintiff potentially overstated the explicitness with which she complained about sex and disability discrimination, there is no direct conflict sufficient to warrant striking any portion of the affidavit.

### 3.  Garza's Affidavit

Finally, Defendant argues that Garza's declaration should be struck entirely because it is "demonstrably false, not based on personal knowledge, contains impermissible hearsay and speculative, conclusory statements without particularized facts." (Mot. Strike, at 3). To start, Defendant takes issue with Garza's statement that Plaintiff "would have gotten an increase in pay if promoted to the Senior Manager position." (Garza Aff., Dkt. 29-5, at 1). Defendant argues that Garza fails to "indicate *how* he knew this, whether he set the salary or knew the pay range, or even if he knew Plaintiff's prior salary." (Mot. Strike, Dkt. 34, at 4). Plaintiff responds that Defendant's corporate representative admitted that Garza was in charge of hiring for the Senior Training and

Compliance manager position. (Pl.'s Resp. Mot. Strike, Dkt. 35, at 3). The Court finds that, because of this authority, Garza had a basis for knowing about the salary increase. That Garza did not explain the details of the salary increase in his affidavit is immaterial.

Defendant also takes issue with Garza's statement that he observed Plaintiff "dedicate extensive time to the Smith Driver Training program, including conducting trainings at 6 a.m. on Saturday mornings." (Garza Aff., Dkt. 29-5, at 2). Defendant argues that the sign-in sheets for Smith System trainings covering the few months Garza was employed with Defendant show only four Saturday morning trainings offered by Plaintiff, none at 6 A.M., and none that Garza attended. (Mot. Strike, Dkt. 34, at 4). The records do show some trainings starting at 6 A.M., (*see* Dkt. 29-14, at 20, 21, 32, 35, 36), and though none occurred on Saturdays, the Court does not find this to be a material conflict. As for the objection that Garza attended none of the trainings, a reasonable jury could find that Garza witnessed Plaintiff preparing for these trainings or otherwise had a basis for his statement. Therefore, the Court will not strike the affidavit on these grounds.

Defendant's final personal-knowledge objection—that he somehow observed Black "treat Plaintiff differently" following her complaint on behalf of Cunningham, even though he is a director of a different department—also goes to the weight of the evidence. (*See* Garza Aff., Dkt. 29-5, at 2). Even if Garza did not work as closely with Plaintiff's department, he may still have observed Black's behavior in some capacity.

In sum, the Court will deny Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence, (Dkt. 34), in its entirety.

## B. Motion for Summary Judgment

Plaintiff brings causes of action for (1) sex discrimination under Title VII and the TCHRA, (Compl., Dkt. 1, at 6–7); (2) retaliation under Title VII and the TCHRA for reporting sex discrimination against her, (*id.* at 7–8); (3) retaliation under the ADA and TCHRA for reporting

Black's alleged disability discrimination against Cunningham, (*id.* at 9–10); (4) disability

discrimination under the ADA and THCRA, (*id.* at 10–11); (5) retaliation for her reasonable

accommodation request to work remotely under the ADA and THCRA, (*id.* at 12–13); and (6)

FMLA interference and retaliation, (*id.* at 13–14).

> 1.  Sex Discrimination under Title VII and TCHRA

To start, the parties disagree whether Plaintiff has presented direct or indirect evidence of

sex discrimination. (Mot. Summ. J., Dkt. 22, at 7; Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 22). Direct

evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or

presumption." *Mooney v. Aratnco Servs. Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995). If a plaintiff can show

direct evidence of discrimination, "the burden of proof shifts to the employer to show that the same

adverse employment decision would have been made regardless of discriminatory animus." *Mooney v.*

*Aramco Services Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995).

In *Brown v. East Mississippi Electric Power Association*, the Fifth Circuit found that a supervisor's

"open and routine use of racial slurs" constitutes direct evidence of discrimination. *Id.* (citing *Brown*

*v. East Mississippi Electric Power Association*, 989 F.2d 858 (5th Cir.1993)). And in *Price Waterhouse v.*

*Hopkins*, the Supreme Court indicated that comments referring to the plaintiff as "macho,"

suggesting that she "overcompensated for being a woman," and advising that she "walk more

femininely, talk more femininely, dress more femininely . . . and wear jewelry, constitute direct

evidence of discrimination." *Id.*

Here, to establish direct sex discrimination, Plaintiff cites Black's comment that he would

"never hire another woman again." (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 23). Though this directly

shows Black's animus towards women, the comment requires "inference or presumption" to show

*Defendant's* animus towards women. Because Black was not the person who chose not to promote

Plaintiff or to terminate her employment, the Court must infer that Defendant took action against

Plaintiff based on Black's discriminatory animus. Therefore, this proof is indirect, not direct, evidence.

In cases where there is no direct evidence of discrimination, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applies. *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 419 (5th Cir. 2009). Plaintiff must first establish her *prima facie* case of sex discrimination. *Id.* To do so, she must establish that she: (1) is a member of a protected class (i.e., female); (2) performed her job satisfactorily; (3) was subjected to an adverse employment action; and (4) similarly situated individuals outside of her protected class (i.e. males) were treated more favorably. *McDonnell Douglas Corp.*, 411 U.S. at 802. If she establishes this *prima facie* case, then the burden shifts to the employer to articulate "some legitimate, nondiscriminatory reason" for the employment action. *Id.* If the employer articulates a nondiscriminatory basis for the adverse action, the burden of persuasion shifts back to the plaintiff to raise a genuine issue of material fact as to whether the employer's "reasons are false or unworthy of credence, and thus merely pretext." *Spears*, 337 F. App'x at 419.

Defendant does not challenge that Plaintiff is within the protected class (i.e. female), but argues that she cannot establish the rest of her *prima facie* case of sex discrimination. (Mot. Summ. J., Dkt. 22, at 8). The Court agrees. Plaintiff focuses her claim of sex discrimination on (1) Black's invitation for Plaintiff and her husband to play Cards Against Humanity at his home; (2) Black's comment that Plaintiff is a "whore," and her daughter's name sounds like a "stripper name"; and (3) his comment that he would "never hire another woman again." Under Fifth Circuit precedent, "comments are evidence of discrimination only if they are "1) related to the protected class of persons of which the plaintiff is a member; 2) *proximate in time* to the complained-of adverse employment decision; 3) *made by an individual with authority over the employment decision at issue*; and 4) related to the employment decision at issue." *Id.* (emphasis added). Comments that do not meet

these criteria are "stray remarks" and, standing alone, "insufficient to defeat summary judgment."

*Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010). Here, the parties agree that

neither the failure to promote Plaintiff nor the decision to terminate her were made by Black. Nor

were Black's comments proximate in time to the relevant decisions. Plaintiff claims that Black made

the Cards Against Humanity comment shortly after she was hired in November 2019, (Pl.'s Resp.

Mot. Summ. J., Dkt. 29, at 3, 5), more than a year before Defendant decided not to promote her in

March 2021 or terminated her in November 2021. And neither Plaintiff nor Martinez could identify

when Black commented that he would "never hire another woman again." (*Id.*). Accordingly, the

Court finds that neither Defendant's failure to promote nor termination decision are "adverse

employment actions" for the purpose of her sex-discrimination claim.

This leaves Plaintiff's complaint that Black subjected her to adverse employment action by

micromanaging her, restricting her duties and authority to conduct trainings and ensure compliance,

leaving her off training events and emails, blocking the use of other Smith System trainings, and

assigning her non-Smith System-related work. Defendant argues that these actions do not constitute

an "ultimate employment decision," and are thus not actionable. (Mot. Summ. J., Dkt. 22, at 8). The

TCHRA addresses only "ultimate employment decisions"; it does not address "every decision made

by employers that arguably might have some tangential effect upon employment decisions."

*Anderson v. Hous. Cmty. Coll. Sys.*, 458 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2015, no

pet.) (citations omitted); *see also Elgaghil v. Tarrant Cty. Junior Coll.*, 45 S.W.3d 133, 142 (Tex. App.—

Fort Worth 2000, pet. denied) ("Title VII and [the TCHRA] were designed to address ultimate

employment decisions, not every action that occurs in the workplace that makes an employee

unhappy."). The Court will therefore dismiss Plaintiff's THCRA sex-discrimination claims arising

out of Black's actions.

The next question is whether Title VII requires an "ultimate employment decision." Plaintiff points to *Hamilton v. Dallas County*, a 2023 Fifth Circuit case that holds disparate-treatment cases do not require an "ultimate employment decision." 79 F.4th 494, 506 (5th Cir. 2023). Rather, a plaintiff "plausibly alleges a disparate-treatment claim under Title VII if she pleads discrimination in hiring, firing, compensation, or the terms, conditions, or privileges" of her employment. *Id.* Further, *Liao v. University of Texas at San Antonio*, which was decided post-*Hamilton*, held that defendant's putting plaintiff in a "disadvantageous position" was enough to allege adverse employment action. This "disadvantageous position" consisted of "[b]eing required to pay over $5,000 in tuition and allegedly being forced to run unsafe experiments." *Id.* at *6. Defendant disagrees with Plaintiff's reliance on *Hamilton* and *Liao*. First, Defendant argues that *Hamilton* addressed a "disparate impact claim, whereas Plaintiff asserts a specific discrimination claim for which there must be a specific adverse action." (Def.'s Reply Mot. Summ. J., Dkt. 32, at 7). However, Defendant does not cite any authority for this contention. And, in attempting to distinguish *Hamilton*, Defendant mischaracterizes *Hamilton* as disparate-impact case when it is really a disparate-treatment case. Second, Defendant complains that "*Liao* merely found a plaintiff's Complaint met the minimum pleadings standard to survive a 12(b)(6) motion to dismiss," but this does not undermine *Liao's* conclusion that actions falling short of ultimate employment decisions may constitute adverse employment decisions for purposes of a disparate-treatment claim. (*Id.*).

The Court concludes that it is unnecessary to rule on *Hamilton*'s impact on this case. Assuming, *arguendo*, that Black's micromanagement is an adverse employment action, Plaintiff's claims still fail because she cannot show pretext. Here, even if Plaintiff can establish a *prima facie* case, Defendant can offer "some legitimate, nondiscriminatory reason" for Black's micromanagement—he was "limit[ing] his employee's focus for the purpose of executing upper management's safety initiative." (Mot. Summ. J., Dkt. 22, at 10). Plaintiff fails to raise a genuine issue

of material fact as to whether this reason is pretext. Black's actions overall promoted Defendant's goal to prioritize Smith System trainings. Plaintiff does not dispute that she knew this was one of Defendant's priorities when she was promoted, nor does she dispute that she knew this was Defendant's *sole* priority by the summer of 2021. Plaintiff attempts to establish pretext by pointing out that Black assigned her other work, (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 23), but Black, as her supervisor, assigning her *one* additional project beyond Smith Systems training fails to raise a genuine dispute of fact. Though Black may have been overbearing in general, Plaintiff does not show that he was overbearing in a discriminatory manner. Rather, Plaintiff testifies that he micromanaged two male employees as well. (Pl. Dep., Dkt. 22-1, at 7 (explaining that Black asked Plaintiff to "document[] everything that Kyle and Lisle [Ford] didn't do or that they didn't do well")). Plaintiff has therefore failed to raise a genuine issue of fact as to whether Defendant's nondiscriminatory reason is pretext, and the Court will grant Defendant's motion for summary judgment on this claim.

In sum, Plaintiff has failed to raise a genuine issue of material fact as to any of her theories of sex discrimination by Defendant. The Court will therefore grant summary judgment on the sex-discrimination claims.

## 2. Retaliation Sex Discrimination Under Title VII and TCHRA

Plaintiff argues that Defendant retaliated against her for complaining about Black's sex discrimination. Because Plaintiff has presented indirect evidence of retaliation, the Court will apply the burden-shifting scheme under *McDonnell Douglas*. *Lyons*, 964 F.3d 298, 304 (5th Cir. 2020). To state a *prima facie* claim for retaliation, Plaintiff must establish that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal nexus existed between the protected activity and the adverse employment action. *Mota v. Univ. of Tex. Houston Health Science Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). If the plaintiff states a *prima facie* claim, the burden shifts to the employer to propose "some legitimate, nondiscriminatory reason" for the employment action." *Id.* If

the employer articulates a nondiscriminatory basis for the adverse action, the burden of persuasion shifts back to the plaintiff to raise a genuine issue of material fact as to whether the employer's reasons are merely pretext. *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020). "Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Id.*

Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. *Id.* at 519; 42 U.S.C. § 2000e-3(a) (2001). Plaintiff claims that she has engaged in protected activity by (1) in November/December 2019, complaining to Martinez, her direct supervisor at the time, that Black had invited her and her husband to his home to play Cards Against Humanity; (2) in November 2020, complaining to Brewster about Black calling her a "whore" and commenting that her daughter's name made her destined to be a "stripper or hooker"; (3) on May 24, 2021, submitting a First Charge of Discrimination to the EEOC, which explicitly referenced sex discrimination and ongoing retaliation by Black; and (4) in June 2021, sending an email to Brewster about Black's ongoing retaliation and attempts to impact her performance. (Resp., Mot. Summ. J., Dkt. 29, at 16–17).

The Court agrees that Plaintiff has engaged in protected activity, or, for instances in which she may have complained about sex discrimination less explicitly, has at least raised a genuine issue of material fact as to whether she engaged in protected activity. The problem begins with her argument that she was subjected to adverse employment action. Once again, as adverse employment action, Plaintiff cites (1) Black's micromanagement; (2) Defendant's failure to promote her; and (3) her termination. The Court will address each of these claims in turn.

First, for Black's micromanagement, assuming again *arguendo* that an ultimate employment decision is not necessary, Plaintiff is unable to establish pretext for the reasons explained above.

25

Second, for her failure-to-promote claim, Plaintiff does not raise a factual issue as to whether Defendant's legitimate reasons are pretextual, which requires that the discrimination would not have occurred "but for" her protected activity.[4] Here, Defendant explains that it chose not to promote her because she did not have the mechanical experience required for the role. (Mot. Summ. J., Dkt. 22, at 3–4). Plaintiff interviewed with Garza, as well as Martinez and Meier, who felt that Plaintiff was not qualified for the role and communicated those concerns to Garza. (*Id.*). Plaintiff does not dispute that the role required someone with mechanical experience, which she did not have.

Plaintiff attempts to raise a factual dispute by citing Garza's declaration, which states that he encouraged her to apply because he felt that she was the most qualified for the role, and Brewster did not want to promote Plaintiff but did not state why. (Garza Decl., Dkt. 29-5, at 1). But no one, including Garza, claims that Brewster had authority over the promotion decision. (Def.'s Reply Mot. Summ. J., Dkt. 32, at 5). And Plaintiff does not suggest Garza even knew about her sex-discrimination complaint. *See Amie v. El Paso Indep. Sch. Dist.*, No. EP-06-CA-113-DB, 2007 U.S. Dist. LEXIS 39749, at *21 (W.D. Tex. 2007) (explaining that to demonstrate a causal connection between the protected activity and the adverse action, a plaintiff must demonstrate that the employer's decision "was based in part on knowledge of the employee's protected activity"). Even if she could show her complaints played a role in the decision, she cannot satisfy but-for causation because she does not raise a factual dispute sufficient to show that Defendant's legitimate reason is pretext. That is, because she does not dispute that Defendant's reason is legitimate, Plaintiff cannot show that but for her sex-discrimination complaints, Defendant would have promoted her.

---

[4] Plaintiff argues that she does not have the burden of satisfying but-for causation. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 19). While the Court agrees that but-for causation is not required for the "causal link" element of Plaintiff's *prima facie* claim, it is Plaintiff's ultimate burden to show but-for causation to succeed on her claim. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (applying the "but-for" causation standard for the "ultimate question" of whether the defendant unlawfully retaliated against plaintiff, "in contrast to the prima facie 'causal link' factor," which is "not as stringent"). Plaintiff does not seem to dispute this, nor does she make any argument that she does satisfy but-for causation.

Accordingly, the Court must grant summary judgment on Plaintiff's retaliation claims arising out of the failure to promote.

Third, as to her termination, Plaintiff fails to offer any facts that indicate Green knew about her sex-discrimination complaint. If the decisionmaker is "unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmaker[] might have been retaliating against the plaintiff for having engaged in that activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003). In Plaintiff's deposition, when asked whether Green knew about her history with Black, her history with Cunningham, her history of having trainings taken away from her, or her EEOC Charges, Plaintiff responded, "I don't know." (Mot. Summ. J., Dkt. 22, at 12–13). When asked directly whether she had facts upon which to base her assumption that Green was retaliating against her, she confirmed, "I don't." (*Id.*). In her response to the Motion for Summary Judgment, Plaintiff once again fails to offer any facts that suggest Green was aware of the complaints. (*See* Pl.'s Resp. Mot. Summ. J., Dkt. 29). Because Plaintiff does not raise a genuine dispute of material fact as to whether Green knew about her complaints, she cannot establish her *prima facie* case of retaliation. Accordingly, the Court will grant summary judgment on these claims.

### 3. Retaliation Under ADA and TCHRA for Reporting Disability Discrimination Against Cunningham

For Plaintiff's retaliation claim based on her complaint about Black's treatment of Cunningham, the Court will apply the same retaliation standard as above. To state a *prima facie* case of retaliation under the ADA or the TCHRA, Plaintiff must establish that: (1) she engaged in a protected activity; (2) she was subject to an adverse employment action by the [employer]; and (3) there was a causal connection between the adverse action and the protected activity. *See Claiborne v. Recovery Sch. Dist.*, 690 F. App'x 249, 259 (5th Cir. 2017); *Seaman v. CSPH, Inc.*, 179 F.3d 297 (5th Cir. 1999). The TCHRA lists protected activities as: (1) opposing a discriminatory practice; (2) making or

filing a charge; (3) filing a complaint; and (4) testifying, assisting, or participating in any manner. Tex. Lab. Code § 21.055 (West 2015). These are also considered protected activities under the ADA. *See Lyons*, 964 F.3d at 304–05. If the employee establishes a *prima facie* case of retaliation, the employer must come forward with a legitimate, nondiscriminatory reason for its action. *Id.* If the employer meets its burden of production, the employee must then demonstrate that the proffered reason is a pretext for retaliation. *Id.* Ultimately, the employee must show that but for the protected activity, the adverse employment action would not have occurred. *Id.*

Plaintiff claims that she engaged in protected activity by complaining about disability discrimination by Black against Cunningham in the January 25, 2021, meeting with Brewster. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 20–21). Defendant argues she did not engage in protected activity because she made no complaints about discrimination related to Cunningham's disability until the First Charge. (Mot. Summ. J., Dkt. 22, at 14–15). Though she did not explicitly mention her disability-discrimination complaint in the email she sent following the meeting, her reference to Black's negative feeling about Cunningham raises genuine dispute of material fact as to whether she raised those complaints in the meeting. (*See* Pl. Dep. Ex. 4, Dkt. 32-1, at 16). Accordingly, the Court finds that she has raised a factual dispute as to whether she engaged in protected activity.

But as with her sex-discrimination retaliation claim, her retaliation claims here fail because she fails to raise a genuine dispute as to whether she can satisfy her ultimate burden. Plaintiff once again points to the same adverse employment actions as she did for her retaliation claim based on her sex-discrimination complaint. And for the reasons above, Plaintiff has failed to establish a genuine dispute of material fact that she can meet her burden of showing that she would have been promoted or would not have been terminated but for her complaints about disability discrimination. Accordingly, the Court will grant summary judgment.

### 4. Disability Discrimination under ADA and THCRA

To establish a *prima facie* case of disability discrimination, Plaintiff must prove she was: (1) actually, or was perceived as, disabled; (2) qualified for the job; (3) subjected to an adverse employment action; and (4) replaced by or treated less favorably than nondisabled employees. *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279–80 (5th Cir. 2000). Plaintiff argues that Defendant discriminated against her because Defendant did not allow her to work remotely after she broke her ankle in October 2021. (Mot. Summ. J., Dkt. 22, at 17).

Here, Defendant argues Plaintiff cannot establish she was replaced by or treated less favorably than a nondisabled employee. (*Id.* at 16). Plaintiff alleges in her Complaint that other employees had been allowed to work from home previously, but in her deposition, she could not "recall" anyone who had been allowed to work from home, let alone anyone similarly situated. (Pl. Dep., Dkt. 22-1, at 41). She failed to identify any other employee who had been allowed to work from home and even conceded that Ford was not allowed to work from home when he had a similar injury. (*Id.* at 42). In her response to the Motion for Summary Judgment, Plaintiff is still unable to identify a comparator. (*See* Pl.'s Resp., Mot. Summ. J., Dkt. 29). Accordingly, Plaintiff has failed to raise a genuine dispute of material fact as to whether nondisabled employees were treated more favorably.

### 5. Retaliation under ADA and THCRA for Accommodation Request

Plaintiff claims that Defendant retaliated against her by failing to accommodate her after she "mad[e] a reasonable accommodation request of working remotely" for 8 to 10 weeks. (Compl., Dkt. 1, at 12; Dkt. 22-7, at 5–7). Under the ADA framework, Plaintiff must show that she is a qualified individual with a disability. As defined by the Code of Federal Regulations, a "qualified individual with a disability" is "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such

individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). "It is well established that an employee who cannot, even with accommodation, perform the essential functions of the job has no claim under the ADA because the employee is not a qualified individual with a disability." *Beaver v. Delta Air Lines, Inc.*, 43 F. Supp. 2d 685, 693 (N.D. Tex. 1999) (citing 29 C.F.R. § 1630.9(d); *Hankins v. The Gap, Inc.,* 84 F.3d 797, 800–01 (6th Cir. 1996)).

Here, the requested accommodation of working from home would have relieved Plaintiff of an essential function of her role to provide Smith System training, which required driving a vehicle in person. (Mot. Summ. J., Dkt. 22, at 19). She concedes that Ford, who was also tasked with administering Smith System trainings, was also not allowed to work remotely. (Pl. Dep., Dkt. 22-1, at 42). Therefore, Plaintiff's ADA retaliation claims fail as a matter of law.

### 6.  FMLA Interference and Retaliation

The FMLA prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise or the attempt to exercise, any right provided under" the act, and prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against an individual for opposing any practice made unlawful" by the act. *Richardson v. Monitronics Int'l*, 434 F.3d 327, 332 (5th Cir. 2005). To make a *prima facie* case of retaliatory discharge, the employee must show that (1) she engaged in a protected activity, (2) the employer discharged her, and (3) there is a causal link between the protected activity and the discharge. *Id.*

It is undisputed that Plaintiff engaged in a protected activity by requesting and applying for FMLA protection. (Pl.'s Resp. Mot. Summ. J., Dkt. 29, at 27). It is also undisputed that Defendant terminated her while she was seeking FMLA leave. (*Id.* at 27–28). Defendant's sole argument is that

Green was unaware of Plaintiff's request for medical leave under the FMLA. However, Martinez testified that he and Green had a conversation after Plaintiff broke her ankle in which Martinez offered to help Plaintiff "get[] [] the paperwork she needed," and specifically mentioned "disability paperwork." (Martinez Dep., Dkt. 29-3, at 23). Martinez also offered to "pick[] her up and bring[] her to the office," suggesting that he knew—and thus, he and Green discussed—that Plaintiff had mobility issues. (*Id.*). A reasonable jury could conclude that Green knew that Martinez was referring to Plaintiff's FMLA documentation and was therefore aware she was applying for FMLA leave. Accordingly, the Court declines to grant summary judgment on these grounds.

## IV.  CONCLUSION

For these reasons, **IT IS ORDERED** that Defendant's Motion to Strike, (Dkt. 34), is **DENIED**. **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment, (Dkt. 22), is **GRANTED IN PART AND DENIED IN PART**. Specifically, the Motion is **GRANTED** as to Plaintiff's claims of sex discrimination, retaliation based on her sex-discrimination complaints, retaliation based on her disability-discrimination complaint, disability discrimination arising out of her broken ankle, and retaliation for her accommodation request for her broken ankle. The motion is **DENIED** as to Plaintiff's FMLA interference and retaliation claims.

**SIGNED** May 27, 2025.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE